## CUTLER-HAMMER MFG. CO. v. AUTOMATIC SWITCH CO. OF BALTIMORE.

(Circuit Court of Appeals, Second Circuit.   January 7, 1908.)

### No. 29.

PATENTS—INFRINGEMENT—AUTOMATIC ELECTRIC SWITCH.

The Blades patent, No. 453,032, for an automatic electric-switch mechanism, in view of the prior art cannot be construed to cover broadly all switch mechanism in which the starter magnet is located on an independent shunt-circuit. As so limited, *held* not infringed.

Appeal from the Circuit Court of the United States for the Southern District of New York.

For opinion below, see 153 Fed. 197.

This cause comes here upon appeal from a decree dismissing the bill in a suit for infringement of U. S. letters patent, No. 453,032, granted May 26, 1891, to Harry H. Blades for automatic electric-switch mechanism.

Keene H. Addington, Robert Lewis Ames, Seward Davis, and W. Clyde Jones, for appellant.

Philip Mauro, Reeve Lewis, and C. A. L. Massie, for appellee.

Before LACOMBE, WARD, and NOYES, Circuit Judges.

LACOMBE, Circuit Judge. The patent in suit relates to an automatic switch for electric motors, commonly known in the art as an automatic starting box or self-starter, by means of which a shunt motor may be started safely from rest, by merely closing the main switch, the self-starter so regulating the cutting in or out of resistances in the armature-circuit that the sudden application of full current at the main switch, which connects with the main generator circuit, will not operate disastrously. The regulation generally of current flow in any circuit by the use of resistances was old in the art. The specification states that the "invention has for its object the production of a switch which shall operate automatically, and which shall at the same time guard properly the gradual introduction of current into the armature circuit or circuits. It is shown as connected with a water-tank, and designed to turn on or off at proper times the current of the motor used to pump water into the tank, and to do the same automatically as water is wasted from the tank, although of course it will be understood that it is applicable in any of the various localities where such alternate turning on and turning off of the current is required. It is also equally applicable where the switch-lever is operated by hand to turn off or turn on the current, and in that event serves to govern the gradual admission of current into the armature-circuits regardless of how quickly the operator may move the hand-lever." So far as the automatic regulation of the switch to generator circuit by the action of water in a tank is concerned, the device is covered only in claims 3 and 4, infringement of which is not charged.

Generally speaking, the mechanism which governs the gradual admission of current into the armature-circuit consists of a contact arm or switch-lever in that circuit, which sweeps over a succession of terminals governing resistances, thus damming up or letting loose the flow of current in the armature-circuit. That contact arm is set in motion, through certain connections by the armature of an electric magnet (or magnets), which armature moves towards or from the magnet as the latter is energized or de-energized. A dash-pot acts as retarding mechanism to retard the movement of the contact arm; and a spring restores parts to position. Current passes to the magnet when the main switch is closed and current brought in from the main (generator) circuit; when that switch is opened and the current from generator cut off the magnet is de-energized and the parts return to normal position—slowly, by reason of the motor acting momentarily as a generator while it is running down.

It will not be necessary to set forth in detail the several parts of the Blades mechanism nor to discuss their action. There are old devices included in the structure; there are differences of form in defendant's device. It is understood that complainants concede that there is no infringement unless the claims relied upon can be so interpreted as to

cover broadly a regulating or self-starting mechanism of the general character shown in the patent (and, indeed, in the earlier art) when the magnet whose energizing and de-energizing is the automatic inspiration of such mechanism is located on an independent shunt-circuit between the terminals of the motor. If we are in error in assuming that so much is "conceded," there need be no motion for reargument, because we are satisfied that the prior art necessitates such a concession. The detailed parts of defendant's mechanism more closely resemble the detailed parts of Fig. 4 of the Whittingham prior patent (415,487, November 19, 1889) than they do anything shown or described in the patent in suit; and complainant undertakes to show invention over such prior patent solely by insisting that in Whittingham the self-starter magnet was located either in the field circuit in the armature-circuit, or in a circuit which had an independent source of supply, while Blades' self-starter is located in an independent shunt-circuit. In this particular suit complainant would accomplish nothing by establishing inventive novelty merely in the structural details of the precise mechanism employed, because defendant's structural details are different. The mere mechanism may or may not be patentable; on that we express no opinion, because in view of the differences in defendant's mechanism that would be an academic question here.

The three claims relied upon are:

"1. An automatic switch mechanism for an electric motor, the same consisting of a switch governing the admission of current to the motor, an electromagnet on an independent shunt-circuit, an automatic switch-lever on the armature-circuit, a series of resistances with their terminals arranged to successively engage the said switch-lever, and a dash-pot to retard the motion of the lever, said lever actuated by the armature of the said electromagnet, substantially as and for the purposes described.

"2. An automatic switch mechanism for an electric motor, the same consisting of a switch for admitting current to the motor, an electro-magnet on an independent shunt-circuit, an automatic switch-lever in the armature-circuit, a series of resistance-terminals in contact with which said automatic switch is adapted to traverse, an armature to said electro-magnet adapted to operate said automatic switch, a dash-pot adapted to retard the motion of the automatic switch, and a spring or springs for restoring the automatic switch to its initial position when the current is cut off from the machine, substantially as described."

"3. The combination with a shunt-wound electric motor on a constant-potential circuit, of a magnet on an independent shunt-circuit between the terminals of the motor, a switch adapted to open and close the armature-circuit, said switch arranged to be held in its closed position by the magnetism of the said magnet, and means for automatically retracting the said switch to its initial position when the magnet is de-energized by the cessations of the current, substantially as described."

Claim 2 differs from claim 1 by the addition of the "spring or springs for restoring." Claim 5 includes hand-starters.

When application was filed in the Patent Office (September 19, 1890), the phrase "an independent shunt-circuit" in claim 1 read "the main circuit through which current is shunted." Defendant's counsel insist that this indicated that at that time Blades had no idea of locating the starting magnet on an independent shunt-circuit, and in their brief reiterate the statement that he originally claimed loca-

159 F.—29

tion "on the main circuit." That is error; what Blades wrote in original claim 1 was "on the main circuit through which current is shunted." That phrase would not accurately describe the main (generator) circuit, because no current is shunted through it; it would fairly describe the wires of the circuit which led from the main switch because through them current shunted from the main (generator) circuit flows. Moreover, before the Patent Office took any action Blades' attorneys wrote to it (October 1, 1890) inserting claim 5, and stating that Blades was already patentee of patent 418,678 of January 7, 1890 (for a hand-starter); that in that patent he claimed a switch held in closed position by a magnet on the field circuit; that he has "now found that he can get as good result when the magnet is on an independent shunt from the main circuit. He therefore wishes to protect himself in this other manner of locating the magnet, hence the additional claim." The drawings and specification remained unchanged from start to finish. Fig. 1 shows details of mechanism with no suggestion as to wiring; Fig. 2 is "a diagrammatic view to illustrate the operation of the said switch"; it is apparent from tracing the circuits shown thereon that there are three, including field, armature, and starting magnet, respectively. There are several statements in the patent which show plainly that Blades intended to use three circuits—"the circuits of the fields and armatures and the circuit of the electro-magnets of the switch." There can be no possible doubt that he shows in his patent a starter-magnet on independent shunt-circuit, nor that he showed a like location for such magnet when he filed his application. Whether the locating of the starter magnet on such circuit, however, constituted patentable invention in view of the prior state of the art is another question.

The lines of wire which conduct electricity from the main supply or generator circuit to the motor where that electricity is to be used are generally referred to as the main circuit of the motor. Diagrammatically they may be represented as two parallel lines between which the different parts of the motor and its adjuncts (if any) are situated. When such parts are connected in series, there will be but a single line of circuit between the two parallels; if the motor be what is known as a "shunt motor" there will be two such lines, one supplying the field and the other supplying the armature. Diagrammatically these are represented as two rungs of a ladder of which the two parallel lines of the main circuit are the sides. It has long been the common knowledge of the ordinary electrical workman that if he wished to put additional electrical devices between the parallels he could either connect them up in series with the electrical device on one or the other rung, or could insert one or more additional rungs on which to place them. Such additional rung would be called an "independent shunt-circuit. Combinations for regulating the cutting in and out of resistances in the armature-circuit by the energizing and de-energizing of an electro-magnet were old in the art. There were mechanical differences between these combinations, and several of them were patented. Such combinations are known generally as "starting boxes" and may be divided into two classes "hand-starters" and "self-starters." Much

is made in argument of this division; much is said of the "self-starter art" as distinguished from the "hand-starter art." But if they can fairly be considered as two arts—and it is difficult to accept that proposition—such two arts are clearly analogous. It would be stretching the doctrine of "special art" altogether too far to hold that the electrical mechanic or engineer who is trying to devise improvements in self-starters is not to be charged with knowledge of what has been done in the way of improvement on hand-starters. It is significant of the close relations between both kinds of starter that the patentee, Blades himself, asked for and secured a claim (No. 5) which includes both hand-starters and self-starters, and was drawn and inserted as an amendment for the express purpose of including them.

Reverting now to the time when Blades applied for his patent, we find that it was common knowledge in the general electrical motor art to put additional electrical devices either on one of the rungs already in use, or upon a new, separate, and independent rung. In setting up starting boxes for shunt motors and generally in regulating motors and generators the art prior to Blades had not confined itself to any one location for the controlling or regulating electro-magnet.

In Fig. 3 of Whittingham (415,487) it had been shown on an independent circuit which either drew its current directly from the generator circuit, or was supplied from some outside source, such as a storage battery or additional generator. In other devices it had been placed on the field circuit, on the armature-circuit, and on an independent "across-the-line" connection or shunt. Apparently each location had its advantages and its disadvantages, and the designer of each particular combination of detailed parts placed it wherever he thought best. It was a question of wiring, it being desirable to locate the magnet in such a place in the system as to call for the least amount of extra wiring and to avoid interference with the functions of the other members of the system. Before Blades it had been located, either in practice or in published patents, in every conceivable location. Under these circumstances, can Blades, by contriving a combination of mechanical parts which will work most efficiently when wired so as to place the switching magnet on a third rung, take out a claim which will cover defendant's combination of mechanical parts —somewhat different from Blades' and precisely shown in a patent prior to Blades' (Whittingham, 415, 487)—merely because defendant, out of the choice which the prior art afforded, elects to wire his combination so as to place the magnet on the third rung? Defendant's expert and counsel concede that cases might arise in which the choice of a location for a particular magnet would involve, not merely the judgment of the skilled electrical engineer, but the exercise of the faculty of invention. But where all locations had already been suggested it will require strong evidence to warrant the issue of what would be in effect a pioneer patent.

In a very long and highly detailed discussion complainant's experts undertake to support the claim to a broad patent upon the theory that the selection of location on an independent shunt-circuit solved a troublesome problem, and is far removed from everything

in the prior art, "by the width of the broad gulf between failure and success." We have the portrayal of an art without an efficient self-starter, man after man skilled in the art suggests the trying of some particular location to overcome existing difficulties, but the adoption of each new location creates difficulties greater than those overcome. For years skillful electrical engineers struggle with the problem where to locate the magnet so that known disadvantages may be eliminated; but all are baffled until Blades discloses to the world that by placing the magnet on independent shunt, so many difficulties are removed that practical success is secured; and, thereupon recognizing its great merit, the art seizes upon Blades' improvement and devices, with the ideal location he has pointed out, achieve a commercial success that practically displaces all other self-starters. If this were an accurate history of the progress of development in that art, it is certainly strange that it should have passed without leaving any trace of its events in the literature of the art. Nowhere is there anything to show that the problem of location was one which occupied the attention of those skilled in the art, or indeed that there was any such problem. From beginning to end of Blades' patent there is no statement, no suggestion, no hint or intimation that location was a baffling problem; that the use of this, that, or the other location was unsatisfactory in result, that by selecting the independent shunt such problem would be solved. He came into the patent office with application for an "improvement in automatic switch mechanism," his specification sets forth his mechanism in careful detail, but calls no attention to what is now claimed to be the great discovery—location on independent shunt. It is true, as was stated above, that there are a few statements in the patent from which and a careful study of Fig. 2 it may fairly be inferred that he did place his electro-magnet on independent shunt; but when, upon criticism by the Patent Office that his first two claims were obscure, he made location "on an independent shunt-circuit" an element of these claims, he writes to the Office:

"Applicant reserves the right to claim in a separate application similar mechanism in which the armature of the electro-magnet actuates the switch lever where the electro-magnet is [in] the field circuit."

It is inconceivable that the applicant who could make this reservation for a field circuit was the man who had just discovered that the solution of all difficulties was to be found, not in mere mechanism, but in location on independent shunt. We find nothing in the record to satisfy us that Blades knew anything about the location problem of which the experts have so much to say, or disclosed any solution of it to the world. Moreover, there is no persuasive evidence that the art hailed Blades as the solver of any such problem, and, by adopting his combination of parts in preference to earlier ones, accorded to it commercial success. Since Blades', self-starters have the starting magnet located on independent shunt, but except some half dozen or so they all have the additional element of a high resistance which can be cut in and out of circuit with the starting magnet, which was the invention covered in the second Whittingham patent (subsequent to

Blades) passed upon by Judge Townsend in Automatic Switch Co. v. Cutler-Hammer Co. (C. C.) 139 Fed. 870, and the introduction of which makes it essential to locate both magnet and resistance on independent shunt. Upon the whole case we are satisfied that Blades disclosed nothing which would entitle him to hold the self-starter art tributary to his patent whenever it uses the magnet of a self-starter on a third independent shunt.

The decree of the Circuit Court is affirmed, with costs.